UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA

and

PATRICK P. O'CARROLL, JR.
INSPECTOR GENERAL OF THE SOCIAL
SECURITY ADMINISTRATION,

                Petitioners,

                                    **SUMMARY ORDER**
        v.                                    13-CV-4405 (PKC)

LARRY FISCHER,

                Respondent.

----------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

        Pending before the Court is the petition of the United States of America and Patrick O'Carroll, the Inspector General of the Social Security Administration ("SSA OIG"), (collectively, "Petitioners"), seeking enforcement of an administrative subpoena *duces tecum* issued to Larry Fischer ("Respondent"), pursuant to 5 U.S.C. app. § 6(a)(4), seeking information and records relating to Respondent's ownership and use of the URL/domain name "socialsecurity.com."  For the reasons set forth below, the Court grants Petitioner's motion, and directs Respondent to comply with the subpoena by October 22, 2013.

*BACKGROUND*

        In late November 2012, SSA received a citizen complaint about the website "www.socialsecurity.com." (Declaration of B. Chad Bungard, Dkt. 1-3, ¶ 5.)  The complainant reported that she had visited the website and was charged $10 for completing a disability

application on the website.[1]  *Id*.  SSA referred the complaint to SSA OIG, which subsequently determined that Respondent was the owner and operator of the website.  *Id.*

On February 6, 2013, SSA OIG sent a letter to Respondent advising him that SSA OIG had determined that the URL/domain name "socialsecurity.com" violated Section 1140 of the Social Security Act ("Section 1140"), which prohibits the use of the words "Social Security," *inter alia*:

> [I]n connection with any item constituting an advertisement, solicitation . . . or other communication . . . alone or with other words, letters, symbols, or emblems . . . in a manner which such person knows or should know would convey, or in a manner which reasonably could be interpreted or construed as conveying, the false impression that such item is approved, endorsed, or authorized by the Social Security Administration.

42 U.S.C. § 1320b-10(a)(1); (Dkt. 1-3 at 7–9.)[2]  The letter further advised Respondent of SSA OIG's conclusion that "[t]he URL socialsecurity.com uses Social Security words in a manner that conveys the false impression that the related destination website is either SSA's official website or is approved, endorsed, or authorized by SSA or that its operator has some connection with, or authorization from SSA."  (Dkt. 1-3 at 7–9.)  The letter also noted that the fact that an individual who clicked on the URL and arrived at the website would realize that it is not affiliated with SSA did not "negate the fact that the URL itself violated Section 1140."  *Id*.

---

[1] At the oral argument regarding this petition, held on October 1, 2013, Respondent disputed the accuracy of the complaint, stating, in sum, that it was impossible for the complainant to have completed a disability application from Respondent's website, and that the complainant must have accessed the application through a different website, which may have been linked to Respondent's website.  The Court, however, considers the accuracy of the citizen complaint immaterial for purposes of this decision.

[2] The page numbers for docketed filings are based on the ECF pagination and not the document's internal pagination.

2

In the letter, SSA OIG requested that Respondent cease using the domain name, and that he provide certain information that would enable SSA OIG to determine whether a civil penalty was warranted, and if so, in what amount. *Id*. ¶ 6.

By letter dated February 26, 2013, Respondent's attorney notified SSA OIG that, while denying any violation of Section 1140, Respondent had disabled the socialsecurity.com website "out of caution." *Id*. § 8. Respondent, however, refused thereafter to produce the information and documents requested by SSA OIG in its February 6, 2013 letter. *Id*. at ¶¶ 9–12.

By letter dated April 9, 2013, Respondent set forth in detail the bases for his refusal to comply with the subpoena, the gist of which was, and continues to be, that Section 1140 does not cover URLs/domain names and that SSA OIG, therefore, lacks the authority to subpoena information relating to an alleged violation of Section 1140 based on the ownership or use of a URL/domain name. (Dkt. 1-3 at 33–41.)

On August 5, 2013, Petitioners filed this motion to enforce the subpoena. Respondents oppose enforcement of the subpoena for the same reasons articulated in his April 9, 2013 letter to SSA OIG. On October 1, 2013, at Respondent's request, the Court held oral argument on the motion (the "Argument").

*DISCUSSION*

I. <u>Appropriate Authority to Interpret Section 1140</u>

The central issue raised by Respondent's challenge to the subpoena is whether this Court, as opposed to an SSA Administrative Law Judge ("ALJ"), should be the first to decide the issue at the heart of Respondent's challenge, *i.e.*, whether Section 1140 applies to URLs/domain names. Respondent seeks to have the Court make that determination; Petitioners argue that the issue is one properly decided through the administrative process in the first instance.

3

The Court declines Respondent's invitation to evaluate the scope of Section 1140 with respect to domain names in this subpoena enforcement action because, as the Second Circuit has held, the Court's "role in a proceeding to enforce an administrative subpoena is extremely limited." *Nat'l Labor Relations Bd. v. Am. Med. Response, Inc.*, 438 F.3d 188, 192 (2d Cir. 2006); *see In re McVane*, 44 F.3d 1127, 1135 (2d Cir. 1995) (citing *Nat'l Labor Relations Bd. v. C.C.C. Assoc., Inc.*, 306 F.2d 534, 538 (2d Cir. 1962)); *Fed. Trade Comm'n v. Rockefeller*, 591 F.2d 182, 190 (2d Cir. 1979); *E.E.O.C. v. United Parcel Serv.*, 587 F.3d 136, 140 (2d Cir. 2009). "[A]t the subpoena enforcement stage, courts need not determine whether the subpoenaed party is within the agency's jurisdiction or covered by the statute it administers." *United States v. Construction Prods. Research, Inc.*, 73 F.3d 464, 470 (2d Cir. 1996). Rather, "the coverage determination *should wait* until an enforcement action is brought against the subpoenaed party." *Id.* (emphasis added).[3] This approach is consonant with the principle that government agencies should be afforded broad latitude to enforce their regulations and investigate potential violations of the same. The Supreme Court has "imposed few constitutional limitations on agencies' power to issue administrative subpoenas." *McVane*, 44 F.3d at 1134; s*ee Okla. Press Pub. Co. v.*

---

[3] As Respondent points out, there is contrary authority in other circuits, where courts have opted to address the underlying scope of administrative subpoenas in circumstances similar to here, where "(1) the subpoena's enforceability depends upon a narrow question of law concerning whether Section 1140 covers URLs as such (2) that does not require factual development as part of agency proceedings (3) of an unprecedented matter (the OIG's authority to regulate domain names) falling outside the agency's body of expertise, (4) where judicial intervention prior to agency proceedings could save the parties significant time and resources, and (5) could provide substantial guidance to similarly situated third parties on an issue of general public importance." (Dkt. 13 at 2 (citing Dkt. 10 at 7–10 n.5)); *see, e.g.*, *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d 490, 492 (7th Cir. 1993) (finding that statutory coverage might be decided in subpoena enforcement proceedings if certain factual issues already were determined); *see also* (Dkt. 10 at 8–10 n.5) (collecting and describing cases). These authorities, of course, do not bind the Court, and there is no indication that the Second Circuit has moved away from its well-established precedent that subpoena enforcement proceedings are not the appropriate venue for reviewing agency interpretations of statutes within their area of expertise.

4

*Walling*, 327 U.S. 186 (1946); *United States v. Morton Salt Co.*, 338 U.S. 632 (1950). In short, "it is sufficient if the inquiry is *within the authority of the agency*, the demand is *not too indefinite and* the information sought is *reasonably relevant*." *McVane*, 44 F.3d at 1135 (citing *Morton Salt*, 338 U.S. at 652) (emphases added).

Respondent argues that SSA OIG's application of Section 1140 to his "socialsecurity.com" URL/domain name is "categorically outside the agency's statutory authority," and that, therefore, this Court should exercise its discretion to decide this issue rather than letting it be heard first by an SSA ALJ. (Dkt. 10 at 6–10.) Were it clear that SSA OIG's subpoena is outside the bounds of the agency's authority, *see E.E.O.C. v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1076–77 (9th Cir. 2001), or raises a significant Constitutional issue, *see United States v. Minker*, 350 U.S. 179, 183–88 (1956), the Court might choose to decide the merits of Respondent's objection. That is not the case here.

As demonstrated by Respondent's extensive and intricately reasoned brief and oral argument, the issue of whether Section 1140 covers URLs/domain names is a close question. As such, it is one that the agency should be permitted to interpret, and the ALJ to rule on, in the first instance. *See Construction Prods. Research, Inc.*, 73 F.3d at 470; *SEC v. Brigadoon Scotch Distrib. Co.*, 480 F.2d 1047, 1053 (2d Cir. 1973) ("it is for the agency rather than the district courts to determine in the first instance the question of coverage in the course of the preliminary investigation into possible violations"); *see also Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 214 (1946) ("We think, therefore, that the Courts of Appeals were correct in the view that Congress has authorized the Administrator, rather than the District Courts in the first instance, to determine the question of coverage in the preliminary investigation of possibly existing violations; in doing so to exercise his subpoena power for securing evidence upon that question,

5

by seeking the production of petitioners' relevant books, records and papers; and, in case of refusal to obey his subpoena, issued according to the statute's authorization, to have the aid of the District Court in enforcing it."). Furthermore, requiring Respondent to first go through the administrative process does not deprive him of the opportunity to have his challenge heard by the courts. (Dkt. 14 at 2–3.) Once SSA OIG issues a penalty letter, if any, Respondent has 60 days in which to request a hearing before an ALJ. If Respondent is dissatisfied with the ALJ's decision, he can obtain judicial review of the decision after the penalty becomes final, which is 30 days after the Respondent is served with the decision. *Id.*; *see* 20 C.F.R. § 498.222 (providing for review by the Court of Appeals of any final action by the Commissioner of the SSA); *Brigadoon*, 480 F.2d at 1052 ("Should the [SSA] seek to exercise regulatory control over [Respondent's] business affairs at some future date . . . [Respondent] will be entitled to a full hearing on [his] contentions.").[4]

Accordingly, the Court declines to decide the merits of Respondent's challenge to the subpoena, namely, whether Section 1140 applies to URLs/domain names, such as "socialsecurity.com."

II.   Propriety of SSA OIG's Subpoena

The Court's duty in considering Petitioners' subpoena enforcement motion is to determine "[1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry *may be* relevant to the purpose, [3] that the information sought is not already within [the agency's] possession, and [4] that the administrative steps required . . . have been followed . . . ." *Am. Med. Response*, 438 F.3d at 192 (citing *RNR Enters., Inc. v. S.E.C.*, 122 F.3d 93, 96

---

[4] Based on the information provided by Petitioners, the average time between the issuance of a penalty letter and the ALJ's issuance of a decision is approximately one year. (Dkt. 14 at 3.)

(2d Cir. 1997)). "A subpoena that satisfies these criteria will be enforced unless the party opposing enforcement demonstrates that the subpoena is unreasonable, or issued in bad faith or for other improper purposes, or that compliance would be *unnecessarily* burdensome." *Id.* (citations and quotations omitted).

### A. Legitimate Purpose

The Court finds that the SSA OIG subpoena was issued as part of an investigation that is being conducted for a legitimate purpose.[5] The Inspector General Act empowers inspectors general "to require by subpoena the production of all information, documents, reports, answers, records, accounts, papers, and other data . . . and documentary evidence necessary in the performance of the functions assigned by this Act." 5 U.S.C. app. 3 § 6(a)(4). Authority to enforce Section 1140 has been expressly delegated to SSA OIG. 42 U.S.C. § 1320b-10(d); *see also* 5 U.S.C. app. 3 § 9(a)(2). In the exercise of its authority to enforce Section 1140, SSA OIG has determined that the statute applies to URLs/domain names that contain the words "Social Security." Because SSA OIG has the authority to assess civil penalties for violations of Section 1140, its issuance of the subpoena to Respondent to obtain information in order to make that determination was proper.

### B. The Other Factors

Respondent does not contest the other three factors, to wit, whether the subpoena (2) is relevant, (3) whether the documents sought already are in the Agency's possession, or (4)

---

[5] The Respondent's opposition to the subpoena is directed to the first element, *i.e.*, whether the subpoena was issued pursuant to an investigation being conducted for a legitimate purpose. Respondent contends that URLs/domain names are outside the scope of Section 1140 and that, therefore, there is no legitimate purpose to the subpoena because the investigation pursuant to which it was issued is not within the SSA's authority. (See, e.g., Dkt. 10 at 1–3.) To answer this question favorably to Respondent, the Court would have to conclude that Section 1140 does not cover URLs/domain names. However, as discussed above, the Court has determined that this is not the proper time or forum for deciding this issue, and declines to do so.

7

whether the Agency followed proper procedures in pursuing the subpoena (such as properly serving the subpoena upon Respondent). Respondent did not respond to Petitioner's arguments regarding the subpoena's compliance with those requirements, and they are deemed conceded for purposes of the instant motion to enforce. *See, e.g.*, *In re UBS Ag Secs. Litig.*, 07-CV-11225(RJS), 2012 WL 4471265, at *11 (S.D.N.Y. 2012) (finding that the defendant conceded the issue through its silence); *Gortat v. Capala Bros., Inc.*, 07-CV-3629(JLG), 2010 WL 1423018, at * 11 (E.D.N.Y. Apr. 9, 2010) (same).

In any event, upon independent review of the record and the parties' submissions, the Court finds that the subpoena complies with those requirements. First, as to relevancy, the Court is constrained to "defer to the agency's appraisal of relevancy, which 'must be accepted so long as it is not obviously wrong.'" *McVane*, 44 F.3d at 1135 (citing *Resolution Trust Corp. v. Walde*, 18 F.3d 943, 946 (D.C. Cir. 1994)). The subpoena seeks any and all documents related to the operation of the socialsecurity.com website, including documents relating to the operators and managers of the website, and the number of instances and the identities of those people who clicked on or viewed the socialsecurity.com website. (Dkt. 10-4 at ECF 3.) This information clearly is relevant to SSA OIG's investigation regarding whether people or the public have been harmed, whether Respondent caused such harm, and, if so, whether civil monetary penalties are appropriate and in what amount.

As for the last two factors, there is no evidence that the documents sought already are in the SSA's possession (Dkt. 1-3 at ¶ 16), and the necessary administrative steps have been followed—Respondent has been served properly with the subpoena.

Lastly, Respondent does not contend that the subpoena is unreasonable, issued in bad faith or for some other improper purpose, or that compliance with it would be unreasonably

8

burdensome, *see Am. Med. Response*, 438 F.3d at 192, and so the Court finds no other basis to conclude that the subpoena is improper or otherwise should not be complied with.

The Court recognizes Respondent's desire to conserve resources by adjudicating his defenses to the SSA's potential enforcement action at this stage, before substantial litigation or discovery has taken place. And Respondent's submissions no doubt raise interesting questions as to the scope of Section 1140. Indeed, by all accounts, the matter appears to be one of first impression in federal courts. Nevertheless, as discussed, under this Circuit's precedent, this Court, at this stage, is not the proper forum for litigating that question.

## *CONCLUSION*

The Court is guided by Second Circuit authority directing it to determine only whether Petitioner's subpoena satisfies the four requirements set forth in cases such as *N.L.R.B. v. American Medical Response*, and declines Respondent's invitation to deviate therefrom. For the reasons set forth above, the Court finds that those requirements have been met, the subpoena is proper, and the subpoena shall be enforced. Mr. Fischer hereby is ordered to comply with Petitioner's subpoena served upon him by October 22, 2013.

      SO ORDERED:

      /s/ Pamela K. Chen
      PAMELA K. CHEN
      United States District Judge

Dated: October 8, 2013
      Brooklyn, New York